James BUEHNER, Plaintiff-Appellant,

v.

John HOEVEN, Jr. and First Western
State Bank of Minot,
Defendants-Appellees.

Civ. No. 9063.

Supreme Court of North Dakota.

April 24, 1975.

Farhart, Rasmuson, Olson & Lian, Minot, for appellant, argued by Steven C. Lian, Minot.

McGee, Hankla, Backes & Wheeler, Minot, for appellees, argued by Robert A. Wheeler, Minot.

PEDERSON, Judge.

## CASE SUMMARY

This is an appeal by plaintiff Buehner from a judgment on a jury verdict in favor of defendants Hoeven and First Western, entered by the district court of Ward County, dismissing Buehner's claim for actual and punitive damages arising out of an alleged fraud, and from an order of the district court denying Buehner's motion for a new trial.

Judgment and Order affirmed.

## FACTS

Prior to August 9, 1969, Buehner was the owner of eighteen shares of common stock in First Western State Bank of Minot (hereinafter First Western). In May 1969 the North Dakota Banking Board ordered First Western to implement a recapitalization plan and, on August 7, 1969, the Federal Deposit Insurance Corporation (hereinafter FDIC) ordered First Western to (1) undertake a recapitalization program, (2) provide a new board of directors, and (3) provide new management. Accordingly, the First Western shareholders voted to reduce the existing outstanding common stock by a six-to-one stock reduction. This reduced Buehner's holding to three shares of common stock. The plan also provided for the issuance of additional common stock and convertible debentures to be sold in units of five shares of common stock, one ten-year capital debenture, and one convertible debenture maturing September 1, 1971.

Buehner purchased three units and thus became the owner of eighteen shares of common stock, three ten-year capital debentures, and three convertible debentures.

Prior to implementation of the recapitalization plan, Hayden Thompson had been the owner of 72% of the common stock and was chairman of the board of directors of First Western. In December 1969 Thompson sold 10,000 shares of his common stock to Hoeven, giving Hoeven an option to purchase additional shares to bring his ownership to 51% and authorizing Hoeven to select a majority of the directors for a period of ten years. Thompson retained ownership of a large block of convertible debentures.

Hoeven became president of First Western and a new board of directors took over management of the bank. Evidence in the record indicates that First Western thrived under the new management.

This case arises out of an allegedly fraudulent retirement of the convertible debentures. The face of the convertible debenture reads, in part, as follows:

"FIRST WESTERN STATE BANK OF MINOT, North Dakota, herein called Bank, for value received, hereby promises to pay the registered holder hereof, the sum of —————, in cash or in capital stock of the Bank on or before September 1, 1971, and to pay interest in cash on the principal amount from time to time remaining unpaid hereon, from September 1, 1969, at the rate of six percent (6%) per annum, payable semi-annually, on the first day of March and September of each year, until this Debenture is paid. The principal hereof and the interest hereon shall be payable at the principal office of the Bank in Minot, North Dakota. To the extent that this Debenture is not paid or retired in cash, *at the option of the Bank*, acting by and with the approval of the Commissioner of Banking and Financial Institutions of the State of North Dakota and of the Federal Deposit Insurance Corporation, the Bank has the right, *at its option*, to repay the principal amount of all of the Debentures in this series by the issuance of shares of capital

stock at the time and at the rates provided for in Paragraph 3 on the reverse side hereof.

"This Debenture is one of an issue of Registered Capital Debentures, Subordinate Convertible Series, duly authorized in the aggregate principal amount of Five Hundred Ten Thousand Dollars ($510,000.00), and issued in deniminations (sic) of $100.00 and multiples and fractions thereof, all of like date, tenor, and terms, except the variations necessary to express the number and the principal amount of each debenture.

"All of the Provisions on the reverse side hereof are a part of this Debenture Bond." [Emphasis added.]

Pertinent paragraphs from the reverse side of the convertible debenture provide as follows:

"3. Payment: The principal amount of all of the Debentures in this series is payable on or before September 1, 1971, in cash or in capital stock of the Bank, *as the Bank may elect, at its option*, acting by and with the approval of the Commissioner of Banking and Financial Institutions of the State of North Dakota and of the Federal Deposit Insurance Corporation. Notice of any payment shall be given by mailing a notice not less than fifteen (15) days prior to the date fixed for such payment to each registered holder. Payment of these Debentures, whether in cash or in capital stock of the Bank, shall be made proportionately on all outstanding Debentures in this series, *unless a registered holder elects to convert* as hereinafter provided. All payments made in capital stock of the Bank shall be at the rate of one share of capital stock of ten dollar par value for each twenty dollars in principal amount of these Debentures (which rate of payment in capital stock is herein called the conversion price). Any balance in the principal amount of these Debentures which remains unpaid on September 1, 1971,

shall thereupon be paid in capital stock of the Bank at the conversion price provided herein. *Notwithstanding the options of the Bank* in making payment on these Debentures, any registered holder may:

"(1) By giving the Bank at least 30 days written notice prior to any interest payment date of these Debentures, *elect to convert* (as of such interest payment date) the Debentures registered to such holder into capital stock of the Bank at the conversion price provided herein. In that event, interest shall nevertheless be paid in cash by the Bank to the interest payment date.

"(2) Upon receipt from the Bank of notice of any payment upon principal in cash by the Bank, *elect to receive* (as of the date of such payment) *capital stock* of the Bank for such cash payment on principal at the conversion price provided herein.

"In the event that the Bank shall at any time after the date hereof and prior to full payment of these Debentures, issue or sell any shares of capital stock or other securities convertible into capital stock in excess of present authorized capital stock, without consideration or for a nominal consideration or upon any reclassification, exchange, split-up, combination, adjustment, distribution, stock dividend, or otherwise, the number of shares of capital stock to be converted hereunder shall be proportionately increased or decreased, as the case may be, and the conversion prices referred to herein shall be correspondingly decreased or increased, as the case may be, to effect the requisite adjustment therein.

\* \* \* \* \* \*

"10. Consent Required for Payment: *Notwithstanding any other provisions* contained in this Debenture, no Debenture shall be paid on demand, retired, called for redemption, purchased, or converted into capital stock by the Bank, whether in whole or in part, unless such

payment, redemption, retirement, call, purchase, or conversion shall have the *prior written approval* of the Commissioner of Banking and Financial Institutions of the State of North Dakota. *Notwithstanding any other provision*, this Debenture is subject to the provisions of Section 18(i)(1) of the Federal Deposit Insurance Act, 12 U.S.C. No. 1828(i)(1), which state that no insured State non-member bank shall, without the *prior consent* of the Federal Deposit Insurance Corporation, retire any part of its capital notes or debentures." [Emphasis added.]

The offering circular prepared and distributed by First Western also indicates that the convertible debenture owner would have an overriding option to convert his debentures into capital stock upon any interest payment date or in lieu of any cash payment on the principal.

On June 9, 1971, on the advice of counsel that the bank had the option of retiring the convertible debentures in cash, the First Western board of directors adopted a resolution to retire such debentures for cash prior to September 1, 1971, and directed the secretary of the bank to transmit copies of such resolution to the Commissioner of Banking and Financial Institutions of the State of North Dakota (hereinafter Commissioner) and the FDIC.

Hoeven wrote a letter to FDIC on June 18, 1971, which stated, in part:

"Our Board of Directors has passed a resolution to pay off completely the $510,000.00 of convertible debentures which mature September 1, 1971, a copy of which is enclosed. We propose to do this by applying $360,000.00 from recoveries and the balance will be made up from the 7 year debenture. We formally request your approval of this transaction."

In a reply dated July 9, 1971, entitled "Order," consent of FDIC was given " * * * to the retirement, by payment in cash. * * * "

Also, on June 18, 1971, Hoeven wrote to the Commissioner, enclosing a copy of his letter of June 18, 1971, to FDIC. The letter included the statement, "We would appreciate a letter from you granting this permission as well."

The Commissioner's reply, dated June 29, 1971, states: "Permission is granted to retire completely the $510,000.00 of convertible debentures which mature September 1, 1971."

On August 16, 1971, Hoeven wrote to each of the debenture holders stating, in effect, that the board of directors had decided to retire the debentures due on September 1, 1971, by cash payment. Checks drawn on the bank for the full face amount of the debenture, plus interest to September 1, 1971, were enclosed. Copies of the communications described immediately above from FDIC and the Commissioner were also enclosed.

Buehner's testimony is that within a week or so after he received the letter and check, he went to the bank and requested of Larry Feidler, a bank employee, that his convertible debentures be converted to common stock. He testified further that when Feidler told him that he must accept a cash retirement under the rules of the bank, which had been approved by FDIC and the Commissioner, he did accept the cash retirement. Feidler denied that this alleged conversation ever took place.

The record indicates that Thompson, who had brought Hoeven into the First Western picture, also was Buehner's principal advisor and witness in this lawsuit. Although Thompson was not a party to the action, his transactions and relationship with Hoeven, the board of directors, and First Western became material to Buehner's efforts to prove a fraudulent motive on the part of Hoeven and First Western.

Buehner's claim is that when Hoeven and First Western discovered that Thompson

would regain majority ownership of the bank's common stock if convertible debentures were permitted to be converted to stock, thus requiring Hoeven to purchase a large amount of Thompson's stock if Hoeven wanted to retain his status as majority stockholder, the fraudulent scheme was motivated. There was no claim that the alleged fraud was designed to prevent Buehner from gaining the few shares that he would be entitled to if conversion was permitted.

On the other hand, defendants Hoeven and First Western claimed that their motive was in the interest of all stockholders— to prevent the dilution of all stockholders' interests, to comply with directives of the supervisory authorities (the FDIC and the Commissioner), and to retain the confidence of the customers of the bank.

It was in light of these claims that transactions involving Thompson, Buehner, the FDIC, and the Commissioner became relevant.

Pursuant to a motion by defendants to require that plaintiff make an election as to recovery in tort versus contract, Buehner filed a return in which he specifically waived his right to recover on the contract.

Buehner brought this action two years after he had accepted a cash retirement of his convertible debentures. The case was tried to a jury in April 1974, and a verdict was returned in favor of defendants Hoeven and First Western. The jury was directed, after reaching a verdict, to answer interrogatories designed by the court to test the accuracy of the jury's conclusions in the general verdict.

Buehner moved that the court grant a new trial, which was denied. This appeal is from both the judgment of dismissal on the jury verdict and the failure to grant a new trial.

## ISSUES

Buehner presented the following issues for review:

1. That the court erred in submitting special interrogatories, along with the court's instructions and general verdict, to the jury.

2. That the court erred in allowing Robert Wheeler, counsel for the defendants, to question James Buehner and John Hoeven, Jr., in regard to a credit card transaction which occurred in the fall of 1969.

3. That the court erred in allowing oral testimony of a conversation at which James Buehner was not present.

4. That the court erred in allowing into evidence Exhibit AA, consisting of three poster boards which show a monetary loss or gain by debenture holders.

5. That the court erred in allowing into evidence Exhibit Y, entitled "Findings of Unsafe and Unsound Practices and Order of Correction."

6. That the court erred in striking portions of plaintiff's Exhibit 7 prior to admitting it into evidence.

7. That the court erred in not granting plaintiff's Requested Jury Instruction No. 19.

## DECISION

### I.

Although we do not deem the specifications of error propounded by Buehner to be determinative in this case, we will discuss these issues.

■ 1. The court did not err in submitting special interrogatories, along with the court's instructions and general verdict, to the jury.

Over the objection of Buehner, the court required the jury to answer special interrogatories to test the accuracy of the jury's conclusions in the general verdict. The court further instructed the jury:

"The Jury shall answer these questions *after* you have arrived at your verdicts and after your Foreman has signed the verdicts on your behalf." [Emphasis by the trial court.]

Buehner argued that the questions were too lengthy and complicated to have been given to the jury. The interrogatories, however, were based upon the language of the statute defining actual fraud, § 9–03–08, N.D.C.C., and articulated the same questions that the jury would have to answer in order to arrive at a verdict. In Hogan v. Knoop, 191 N.W.2d 263, 274 (N.D.1971), this court said:

"The mere fact that the jury was required to answer the same questions in writing that it otherwise would have had to answer in order to determine a general verdict did not result in prejudice."

Assuming that Buehner's position is valid and that the interrogatories were too lengthy and complex for the jury to understand their impact on the general verdict, we hold that understanding the impact is not necessary, even though the interrogatories to be answered might ultimately affect the validity of the verdict.

The court did not err in submitting the special interrogatories to the jury.

2. The court did not err in allowing counsel for the defendants, Robert Wheeler, to question James Buehner and John Hoeven, Jr., in regard to a credit card transaction which occurred in the fall of 1969.

■ When fraud is an issue in a lawsuit, the credibility of witnesses is a significant factor. The testimony of Buehner was of great significance to the plaintiff's case. Any bias on his part is relevant in assessing his credibility. In McCormick on Evidence, 2d Ed., § 40, at 78 (1972), the author discusses credibility:

"The law recognizes the slanting effect upon human testimony of the emotions or feelings of the witness toward the parties or the self-interest of the witness in the outcome of the case. Partiality, or any acts, relationships or motives reasonably likely to produce it, may be proved to impeach credibility."

Cross-examination of a witness is an important tool in eliciting such feelings from a witness. Therefore, any prior dealings between Buehner and First Western are relevant considerations.

■ Counsel must point out to the court the purposes for which the evidence is not admissible and ask for an instruction limiting the consideration of that evidence by the jury to the purpose for which it is admissible. Smith v. Knutson, 78 N.D. 43, 47 N.W.2d 537 (1951).

■ While cross-examining, opposing counsel has considerable latitude in eliciting from an adverse witness the answers and admissions which are pertinent to the trial of a case. Linington v. McLean County, 161 N.W.2d 487 (N.D.1968).

■ The trial court properly refused to allow questions indicating that Buehner had been guilty of, or convicted of, a crime. Discussions in chambers disclosed that Buehner had been charged with a crime in connection with a credit card transaction, but the case was disposed of under the so-called "Brooklyn Plan." Under this plan, not specifically authorized by federal statute or rule but sometimes used in the federal courts, a defendant may be allowed to agree to make restitution and be placed on probation, with the understanding that charges will be dismissed if the conditions agreed to are complied with. This system of disposing of a criminal case without prosecution is somewhat similar to the "pretrial diversion" proposed in the Uniform Rules of Criminal Procedure (1974) by the National Conference of Commissioners of Uniform State Laws, Rule 442, and by the National Advisory Commission on Criminal Standards and Goals, Standards 2.1 and 2.2, Task Force on the Courts.

After denying, on cross-examination, any previous dealings with Hoeven, Buehner withdrew the denial on redirect examination and thereafter other witnesses were examined about a credit card transaction.

■ Buehner argues that the questions and answers relating to the credit card transaction were designed to lead the jury to infer criminal activity by the plaintiff and that this was highly prejudicial. There were references to a postal inspector visiting Buehner and to a "stolen credit card." Such references, some of which were not objected to, do not impute the commission of a crime by Buehner. See State v. Hilling, 219 N.W.2d 164 (N.D.1974). Further, any adverse inference was effectively negatived by Hoeven's statement that he did not imply that the card was stolen by Buehner.

Buehner refers us to the general rule from 98 C.J.S. Witnesses § 484b(3), at 373, which indicates that collateral matters brought out on cross-examination may not be contradicted by other witnesses. He also cites 20 Am.Jur.2d Evidence, § 365, relating to restrictions on the use of collateral proof to show motive, intention, malice or ill will, good or bad faith, or other state of mind, when such becomes an issue in a civil action.

The Minnesota Supreme Court said in Greene v. Mathiowetz, 212 Minn. 171, 3 N.W.2d 97 (1942), that a witness cannot be interrogated on collateral matters merely for the purpose of contradicting him and "the reason for this rule is plain, since, if it were not enforced, the issues in many cases might be multiplied indefinitely so that the jury would be likely to lose sight of the real controversy."

In an 1897 case, the matter of contradictory answers to questions that are collateral to the issue was discussed in an opinion written by Justice Wallin. After reciting various versions of this well-established rule, the court said:

"The philosophy of the rule is that it tends to prevent the multiplication of ir-relevant issues, which, if permitted to be lugged into the case, would not only protract trials to an interminable length, but would directly tend to confuse and divert the minds of the jury from the merits of the case on trial, and thereby tend to thwart the chief purposes of the law." State v. Haynes, 7 N.D. 70, 77, 72 N.W. 923, 925 (1897).

See also, State v. Ave, 74 N.D. 216, 21 N.W.2d 352 (1946); Schmidt v. Stone, 50 N.D. 91, 194 N.W. 917 (1923); Schnase v. Goetz, 18 N.D. 594, 120 N.W. 553 (1909); Kaeppler v. Red River Valley Nat'l Bank, 8 N.D. 406, 79 N.W. 869 (1899); 29 Am.Jur.2d Evidence, §§ 365, 366; 3A, Wigmore, Evidence, § 1000 (Chadbourn rev. 1970).

The interrogation here was not merely for the purpose of contradicting the witness or protracting the trial, but related to the witness's motive and was restricted sufficiently so as to not cause the jury to lose sight of the real issue. The trial court did not abuse its discretion in allowing the testimony and Buehner's substantial rights were not affected. There was no error.

■ 3. The court did not err in allowing oral testimony of a conversation at which Buehner was not present.

Both Hoeven and Orlin Backes, an attorney who was present, testified to a statement by Thompson to the effect that he didn't "give a God damn about the other stockholders." This statement was offered as impeachment of Thompson, who had previously testified on direct examination that he "did feel some responsibility to the old stockholders and the old convertible debenture owners." An attempt was made to lay the predicate for impeachment. [Thompson neither admitted nor denied making the statement.] But the predicate was imperfectly laid because the place, time, and persons present were not identified. Hedine v. Meyer, 57 N.D. 908, 224 N.W. 906 (1929). However, no objection was made for lack of foundation. The only objection was that

the testimony was hearsay. It was hearsay, but was admissible as impeachment, in the absence of any objection to foundation.

4. The court did not err in allowing into evidence Exhibit AA, consisting of three poster boards which show a monetary loss or gain by debenture holders.

5. The court did not err in allowing into evidence Exhibit Y entitled "Findings of Unsafe and Unsound Practices and Order of Correction."

6. The court did not err in striking portions of plaintiff's Exhibit 7 prior to admitting it into evidence.

Exhibits AA and Y were material to the defendants' defense against the allegation of an overall scheme to defraud, and also relevant to the defendants' assertion that their actions were taken in good faith and in the best interests of all parties involved.

■ Buehner made many objections to Exhibit AA, including an objection that it was not the best evidence. The records were not in court but were at the bank, in the same city in which the trial was held, and were available.

While the records should have been offered in evidence or at least produced in court, they apparently were available to the plaintiff. At one point he asked the witness who prepared the summary to go and examine the records and report back, and this apparently was done. The rule as to admissibility of summaries of voluminous documents is stated in Linnell v. London & Lancashire Indemnity Co., 74 N.D. 379, 22 N.W.2d 203, 206 (1946):

"While ordinarily the testimony of an accountant may not be admitted in evidence to show the contents of books of account there are two exceptions to the rule. The first exception is thus stated in the fourth paragraph of the syllabus by this Court in Baird v. National Surety Co., supra 'The court may, in its discre-

tion, permit a competent witness, who has examined the books with reference to the points sought to be established, to testify to the result of his examination, or to present schedules verified by his testimony showing the details of the computation he has made, where the facts sought to be proved are of such character and the books are so voluminous that the examination of each item would be very laborious.'

"This rule presupposes that the books have either been introduced in evidence or are available to the court and to opposing counsel. * * * *"

In view of the ready availability of the records, we believe the absence of the records from the courtroom was, in this case, error without prejudice.

No effort was made by Buehner to show the market value of the stock. The records of First Western would not show the market value of the stock but rather the actual book value based upon the condition of the bank.

■ Exhibit Y is a copy of the FDIC order which was the basis of the entire recapitalization program that resulted in the issuance of the convertible debentures. It is the subsequent treatment of these debentures that resulted in this litigation. Buehner could not have been prejudiced by its admission.

■ Exhibit 7 was the agreement by which Hoeven purchased a portion of Thompson's interest in First Western. Buehner objected to striking portions of the agreement that related to Hoeven's salary. This same information was subsequently introduced into evidence through the testimony of Hoeven, without objection. Therefore, the issue is moot.

We find no error in the admission of the three exhibits.

■ 7. The court did not err in not granting plaintiff's requested jury instruction No. 19.

The requested jury instruction read as follows:

"You are instructed that the debenture bond is a legal contract between the parties and that the provisions of the instrument govern any transactions between them.

"You are further instructed that notwithstanding any options of the bank under the debenture bond the individual Bondholder did have the right to request stock rather than cash subject only to provision 10 of the debenture bond relating to the supervising authorities, and further that the Bank had no right to refuse a request for stock but only the supervising authorities could do so."

Under the evidence presented, there was a question of fact whether the supervising authorities had specifically ordered that the debenture bonds be redeemed only in cash or whether the supervising authorities had left open the option of exchange of stock for the debenture bonds. Testimony of representatives of the State Examiner and the Federal Deposit Insurance Corporation was before the jury. Since the preliminary question was one of fact, and since Buehner elected to waive his contract and sue in tort, there was no error in refusing plaintiff's requested jury instruction No. 19.

## II.

In his second amended complaint Buehner alleged that Hoeven, individually and as president of the First Western Bank, made false and fraudulent representations concerning the retirement of the convertible debentures. Buehner further alleged that these representations were part of an overall scheme to defraud. The question for review before this court becomes a determination of whether or not there was substantial evidence to sustain the jury verdict.

Fraud is either actual or constructive. Section 9–03–07, N.D.C.C. In the case at bar, actual fraud is alleged. Section 9–03–08, N.D.C.C., defines actual fraud:

"Actual fraud within the meaning of this title consists in any of the following acts committed by a party to the contract, or with his connivance, with intent to deceive another party thereto or to induce him to enter into the contract:

"1. The suggestion as a fact of that which is not true by one who does not believe it to be true;

"2. The positive assertion, in a manner not warranted by the information of the person making it, of that which is not true though he believes it to be true;

"3. The suppression of that which is true by one having knowledge or belief of the fact;

"4. A promise made without any intention of performing it; or

"5. Any other act fitted to deceive."

 Fraud is never presumed. Pauly v. Haas, 84 N.W.2d 302 (N.D.1957); Hablas v. Armour and Company, 270 F.2d 71 (8th Cir. 1959). Fraud must be proved by evidence that is clear, satisfactory, and convincing. Verry v. Murphy, 163 N.W.2d 721 (N.D.1968). Where, as in the instant case, circumstantial evidence is relied upon to show fraud, it is not sufficient that the circumstances raise a suspicion of fraud. Engen v. Kincannon, 79 N.W.2d 160 (N.D. 1956).

 In Watkins Products, Inc. v. Stadel, 214 N.W.2d 368 (N.D.1973), this court held that the existence of fraud is ordinarily a question of fact to be decided by the trier of the facts. Moreover, actual fraud is always a question of fact. § 9–03–10, N.D.C.C. In Gershman v. Engelstad, 160 N.W.2d 80, 83 (N.D.1968), this court said:

"There is no general rule for determining what facts will constitute fraud. Whether there were fraudulent representations or not in a given case must depend upon the facts in each case."

Our review of questions of fact is limited to a consideration of whether or not there is substantial evidence to sustain the verdict. See Watkins Products, Inc. v. Stadel, *supra*; Seaborn v. Kaiser, 117 N.W.2d 863, 870 (N.D.1962); In re Hendricks' Estate, 110 N.W.2d 417, 421 (N.D.1961). If there is such evidence, we are bound by the verdict. When the jury returned a verdict for the defendants, it was presumed that all questions of fact within the province of the jury had been determined in favor of the defendants. Watkins Products, Inc. v. Stadel, *supra*.

In determining whether the evidence is substantial we do not invade the province of the jury to weigh the evidence or determine the credibility of witnesses. Grant v. Jacobs, 76 N.D. 1, 32 N.W.2d 881, 886 (1948). We must view the evidence in the light most favorable to the verdict. Trautman v. New Rockford-Fessenden Co-op Tr. Ass'n, 181 N.W.2d 754, 763 (N.D. 1970); Gleson v. Thompson, 154 N.W.2d 780 (N.D.1967). It is only when the evidence is such that reasonable men can draw but one conclusion therefrom that it becomes a question of law for the court.

In order to constitute actionable fraud, Buehner had to show that the representations were made with knowledge of their falsity and with intent to deceive, Coman v. Williams, 65 N.W.2d 377, 379 (N.D.1954), and that he relied upon the alleged false and fraudulent representations, Leach v. Kelsch, 106 N.W.2d 358 (N.D.1960). In addition, to support a legal action, Buehner had to establish that the alleged false and fraudulent representations produced an injury. Verry v. Murphy, *supra*.

The jury could have reasonably found that Buehner failed in his burden to produce the necessary preponderance of substantial evidence that the actions of Hoeven and First Western constitute actionable fraud, or that he failed to show reliance on the alleged false and fraudulent representations, or that he suffered actual damages.

The judgment and order denying a new trial are affirmed.

ERICKSTAD, C. J., and PAULSON, VOGEL and SAND, JJ., concur.