**In re Robert L. VALEU and Marjorie A. Valeu, Debtors.**

**James A. HASBROUCK and Frances A. Hasbrouck, Plaintiffs,**

**v.**

**Robert L. VALEU and Marjoria A. Valeu, Defendants.**

**Bankruptcy No. 84–05314.
Adv. No. 85–7042.**

United States Bankruptcy Court,
D. North Dakota.

Jan. 2, 1986.

Robert Busch, Bismarck, N.D., for plaintiffs.

Jack McDonald, Bismarck, N.D., for defendant.

## MEMORANDUM OPINION
## AND ORDER

WILLIAM A. HILL, Bankruptcy Judge.

The Plaintiffs, James A. and Frances A. Hasbrouck, commenced the instant adversary proceeding seeking recovery of a real estate down payment alleged to be non-dischargeable by virtue of section 523(a)(2)(A) of the Bankruptcy Code. The case was tried on November 20, 1985. The only remaining Defendant is Robert L. Valeu, the other Defendants having been dismissed out by previous court orders. As material to the Court's decision herein, the facts may be stated as follows:

### FINDINGS OF FACT

James Hasbrouck is a teacher who, in 1981, was uncertain whether he wanted to remain in the profession. In that year, he interviewed for and received a teaching position in Mandan, North Dakota. Not wishing to commit himself permanently either to Mandan or the teaching profession, he approached Robert Valeu in that summer regarding the possibility of renting a duplex unit (hereinafter referred to as the Home). Valeu, at the time, was a real estate developer who, although not active in real estate sales, did until the end of 1983 hold a realtor's license. After some negotiations, the parties reached a bifurcated arrangement whereby Hasbroucks would purchase the Home but lease the underlying land upon which it was erected. Hasbroucks expressed some initial reluctance to enter into a long-term commitment in Mandan but were orally assured by Valeu that he would buy back the property in the event they should decide to leave the

area. Valeu at trial agreed that the repurchase understanding in 1981 was that if Hasbroucks could not remain in the area, he would buy the property back for what they had paid.

With these assurances, Hasbroucks on August 21, 1981 signed two documents, a "Contract for Bill of Sale" (CONTRACT) of the Home and a "Ground Lease" (LEASE) for the lot. The documents were prepared by Valeu and reviewed by Hasbroucks prior to signing. The purchase price of the Home was $53,290.00 with credit given for previous rents and security deposit. Terms were $20,000.00 down and monthly payments of $317.03 for 30 years. The lease provided for monthly payments of $25.00 with an option to purchase. Default in the Contract terms of payment gave the seller the right to cancel the Contract by written notice. A similar default provision was contained in the Lease.

Although ground leases were strange to him, Mr. Hasbrouck was familiar with real estate purchases and the necessity of recording. In this case, however, both Mr. Hasbrouck and his wife were told by Valeu at the time of signing that they need do nothing further and that he would take care of everything. Hasbroucks assumed Valeu was a knowledgeable real estate person and left the two documents with Valeu's secretary believing Valeu would take care of any recording requirements. Neither document was ever recorded.

Hasbroucks paid the $20,000.00 down and made all the other required payments until May 1983 when they left Mandan. Problems began in January 1983 when Mr. Hasbrouck contacted Valeu telling him that he was thinking of leaving Mandan and whether Valeu would repurchase in the event the move was made. Valeu again orally assured Hasbroucks that he would repurchase but that he would like to try selling the Home first. Valeu's recollection of this January conversation is that Hasbroucks had already made a decision to leave and that his only promise with regards to selling the property was that he would try to market it after Hasbroucks

had left. Mr. Hasbrouck, however, testified that before he gave up his employment contract with the Mandan schools, he asked Valeu if they should try to market it themselves but were assured by Valeu that he had someone working on it. From the inception, Valeu's assurance that he would repurchase the property was important to the Hasbroucks. According to Mr. Hasbrouck, it was the continuous assurance that caused him to make the decision to leave Mandan.

Aside from calling Hasbroucks on one occasion in January about showing the house, Valeu did nothing in an effort to sell it until late spring 1983. From January to May, Hasbroucks kept after Valeu wanting something accomplished and Valeu, during this time, continued to assure them that he had someone working on it and that in any event he would repurchase it himself if necessary. Finally, on May 25, 1985, Valeu and the Hasbroucks entered into a document termed "Purchase Agreement" (AGREEMENT) whereby Valeu agreed to purchase the Home from Hasbroucks for $53,016.32 by Valeu assuming the Contract balance and paying $20,000.00 cash to Hasbroucks in two equal installments, the first coming due by July 22, 1983, and the second by August 19, 1983. This Agreement is drafted as a Purchase Agreement whereby Hasbroucks are denominated as Sellers, and Valeu is denominated as the Purchaser. It contains no reference at all to any previous arrangement between the parties but provides that upon default, Hasbroucks have the right to cancel the Agreement upon written notice. With this Agreement executed, the Hasbroucks thought their interests were secure, and they moved from Mandan several days after its execution. Like the two other documents, this Agreement was left with Valeu; and like the others, it was never recorded.

Valeu missed the first payment due under the Agreement but assured Hasbroucks on various occasions that he was trying to sell the Home and the payment would be forthcoming in a few days. In this regard, Valeu at one point told them he

was selling other real estate and Hasbroucks would be paid from those proceeds. Hasbroucks assumed the May 1983 Agreement was made in fulfillment of Valeu's previous promises to repurchase.

In fact, Valeu made no effort to sell the Home until June 1983 when he listed it with a real estate firm. This listing was unfruitful, but a subsequent December 1983 listing produced a buyer on December 7, 1983. Despite Hasbroucks' continuing inquiries, Valeu did not tell them about the December sale; and Hasbroucks did not discover it until February 1984 when, in answer to a phone inquiry, Valeu told them the property had been sold and the proceeds had gone to other creditors. Prior to this, Hasbroucks had taken no steps to cancel the May 1983 Agreement because of the continuing assurances by Valeu that he was working on the sale and that the money was forthcoming. On one occasion, Valeu had advised Mr. Hasbrouck that he had sent a check but that it had been lost and that he would send another.

Valeu at trial stated that he felt no obligation to advise Hasbroucks of the December sale because, in his opinion, Hasbroucks by leaving the property in May 1983 and ceasing to maintain the monthly payments required under the 1981 Contract had breached their 1981 Contract. Despite this belief, Valeu initiated no action to cancel the 1981 Contract because he believed the 1983 Agreement had changed his rights on default. Exactly how he felt his rights had been modified was not elicited at trial.

Due to the failure to record any of the documents evidencing the 1981 transaction, the record owner of the Home and lot was Valeu and Associates I who transferred the property to Valeu and his wife on February 2, 1984, and who in turn and in consequence of the December 1983 sale transferred it to the ultimate purchasers, Charles and Lucinda Bullinger. After satisfaction of the first mortgage, the sale to Bullingers netted $10,453.12 to Valeu from which he paid off the balance due on the Ground Lease, paid a realtor's fee, reimbursed himself for mortgage payments incurred be-

tween June 1, 1983, and December 1, 1983, and paid for various other expenses, the net result of which according to Valeu was a net loss to him of $4,444.06.

Although Valeu's recollection was not clear, it appears that he used Hasbroucks' $20,000.00 down payment for construction costs on the Home as well as meeting a few of the mortgage payments. The $20,000.00 used by Hasbroucks as a down payment constituted their major asset, and it is this sum as evidenced in the May 1983 Agreement that they seek to have declared a non-dischargeable obligation, together with interest which has accrued since the July and August 1983 payment dates.

## CONCLUSIONS OF LAW

Section 523 of the Bankruptcy Code provides, in part:

(a) A discharge under section 727, 1141, or 1328(b) of this title does not discharge an individual debtor from any debt—

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

11 U.S.C. § 523(a)(2)(A). The alleged instances of fraud complained of by Hasbroucks begin with the statements made by Valeu causing Hasbroucks to believe he would record the Contract and the Lease and that there would be nothing more for them to do in order to perfect their interest in the Home or lot and Valeu's continuing assurances that he would market the property and repurchase it if unsuccessful. In consequence, Hasbroucks assert they did not record any of the documents themselves and, by Valeu's continuing assurances, believed their interest to be protected by the 1983 Repurchase Agreement and in reliance thereon ceased making payments on the 1981 Contract and left the area. In fact, they charge, they were deceived into unwittingly relinquishing their interest in the property. Valeu denies any omissions or failure on his part and sug-

gests that he carried out his promises and always intended to repurchase the property, an intent which ultimately could not be carried out because of later financial reverses. Accordingly, he claims any sum still owing is merely a debt owing by a debtor to a creditor and is not the result of any fraudulent conduct.

▆▆▆▆ Whether Valeu's action is characterized as a false pretense, a false representation or actual fraud, the essence of the cause of action under section 523(a)(2)(A) is deception. Fraud as a term is not defined in the Bankruptcy Code itself, but if one refers to the North Dakota Century Code, actual fraud is defined as any of the following acts: (1) suggestion as fact of that which is not true by one who does not believe it to be true; (2) the positive assertion, in a manner not warranted by the information of the person making it, of that which is not true though he believes it to be true; (3) suppression of that which is true by one having knowledge or belief of the fact; (4) a promise made without any intention of performing it; or (5) any other act fitted to deceive. N.D.C.C. § 9–03–08. Fraud may also be characterized as misrepresentation where an action intended or expected by the perpetrator to result in forbearance or inaction causes such result. The restatement teaches that:

> "One who makes a fraudulent misrepresentation is subject to liability to the persons or class of persons whom he intends or has reason to expect to act or to refrain from action in reliance upon the misrepresentation, for pecuniary loss suffered by them through their justifiable reliance and the type of transaction in which he intends or has reason to expect their conduct will be influenced."

Restatement (Second) of Torts, *Misrepresentation* § 531. Fraud, whether alleged under state law or in a section 523 bankruptcy action, is never presumed but must be proved by clear and convincing evidence. *In re Mutschler*, 45 B.R. 482 (Bankr.D.N. D.1984); *In re Wightman*, 36 B.R. 246 (Bankr.D.N.D.1984); *Buehner v. Hoeven*, 228 N.W.2d 893 (N.D.1985). In order to successfully maintain a cause of action un-

der section 523(a)(2)(A) of the Bankruptcy Code, the plaintiff must establish the following elements:

  (1) the debtor made representations;

  (2) that at the time made, he knew them to be false;

  (3) that the representations were made with the intention and purpose of deceiving the creditor;

  (4) that the creditor reasonably relied on the representations;

  (5) that the creditor sustained the alleged injury as a proximate result of the representations having been made.

*See In re Houtman*, 568 F.2d 651 (9th Cir.1978); *In re Vickers*, 577 F.2d 683 (10th Cir.1978); *Sweet v. Ritter Finance Co.*, 263 F.Supp. 540 (W.D.Va.1967); *In re Mutschler*, supra.; *In re Wightman*, supra. Each of the specific elements enumerated above need not be individually identified in a particular case since a person's intent is often incapable of direct proof and may be inferred from the totality of circumstances surrounding a transaction. *Shainman v. Shears of Affton, Inc.*, 387 F.2d 33 (8th Cir.1967); *In re Pommerer*, 10 B.R. 935 (Bankr.D.Minn.1981). Similarly, the element of fraud itself may be implied from the circumstances if those circumstances present a clear showing of deceptive conduct on the part of a debtor which indicates an intent on his part to cheat and deceive. *In re Diaz DeVillegas*, 26 B.R. 600 (Bankr. S.D.Fla.1983); *In re Holcombe*, 23 B.R. 590 (Bankr.E.D.Tenn.1982). The court in *Holcombe* held that if the totality of the circumstances present a picture of deceptive conduct which indicates an intent to cheat and deceive, the intended falsehood, coupled with this conduct, is sufficient to establish the requisite intent. *Holcombe*, 23 B.R. at 592 (citing *Matter of Clark*, 1 B.R. 614 (Bankr.M.D.Fla.1979)). It is in view of the foregoing legal concepts that the facts of the instant case are reviewed.

The facts of this case first of all establish that Hasbroucks did not wish to purchase a house in the Mandan, North Dako-

ta area unless they could be assured of being able to get rid of it on relatively short notice in the event they wish to leave. It was with this rather clear understanding that they agreed to buy the Mandan Home from Valeu. Valeu initially assured them he would buy it back if the occasion arose. The Court is also satisfied from the facts that Hasbroucks left the Contract and the Lease with Valeu reasonably believing that he would take care of whatever else needed to be done. After all, Valeu was a knowledgeable real estate investor familiar with the area and, in this instance, as a party to the transaction and drafter of the documents, must be presumed to have known that his relationship to Hasbroucks and his interest in the Home was being affected by the documents and that recordation would be necessary in order to protect Hasbroucks' interest from unknowledgeable third parties. As between Valeu and Hasbroucks, the documents were valid despite being unrecorded. North Dakota Century Code § 47–19–46 provides that an unrecorded interest is valid between the parties thereto, the effect of which is that the holder of an unrecorded instrument succeeds to all rights of the record owner. *Collins v. Federal Land Bank of St. Paul,* 119 F.2d 228 (8th Cir.1941) (construing section 5598 N.D.Comp.Laws 1913, the predecessor to N.D.C.C. § 47–19–46). Hasbroucks, by Valeu's initial statements, were left with the erroneous but reasonable impression that their interest was protected beyond Valeu as immediate seller. Valeu actively promoted this mistaken impression when he told the Hasbroucks to leave the documents with his secretary and that he would take care of it. This created the implication that either there was nothing more to do or that if there was something further to be done, Valeu would do it.

Valeu continued to foster Hasbroucks' belief that he would repurchase the property and finally, in 1983, Mr. Hasbrouck, in reliance on this assurance, gave up his position in Mandan and then, continuing to trust Valeu, entered into the 1983 Agreement. The Agreement gave Hasbroucks the right to terminate upon Valeu's default in regard to the installment payments and get the property back. Perhaps Hasbroucks should have taken steps to cancel the Agreement, but they continued to receive promises from Valeu that a payment would be forthcoming and consequently did nothing until it was too late. Indeed, except for the legal effect of Valeu's continued assurances, Hasbroucks could be regarded as having slept on their rights. Valeu takes inconsistent positions regarding the documents in question. He first of all argues that the 1983 Agreement was a modification of the 1981 Contract but then claims that he regarded the 1981 Contract to be in default by Hasbroucks abandoning the premises in May 1983. Yet he acknowledges that he did not at any time declare the 1981 Contract in default nor notify Hasbroucks of such default as is required by the 1981 Contract. Rather, he simply sold the property without telling them anything, leaving them all the while believing the property had been purchased by Valeu according to the 1983 Agreement. Valeu also takes the position that Hasbroucks voluntarily extended the time for repayment set forth in the 1983 Agreement. This Court does not understand how Valeu can rely on the 1981 Contract as a basis for his right to sell the property contrary to its notice provisions and at the same time argue that whatever rights Hasbroucks had were only as set forth in the 1983 Agreement, rights which they voluntarily gave up. The 1981 Contract and the 1983 Agreement, by their terms, do not appear to be interrelated despite Valeu's insistence to the contrary. It is difficult for the Court to reconcile these documents and the rights they purportedly create because the 1983 Agreement is not couched in terms of a repurchase agreement, it makes no reference to the 1981 Contract, nor does it make any reference to the previous and allegedly subsisting relationship between Hasbroucks and Valeu as defined in the 1981 Contract. Reviewing the 1981 and 1983 documents together suggests to this Court a conflict in terms, and this Court can readily understand how Hasbroucks

could have been misled by them. By the 1981 Contract, Valeu as Seller sold the subject property to Hasbroucks and then, by the 1983 Agreement, Hasbroucks as Sellers sold the property back to Valeu. The 1983 Agreement does not by its terms modify the 1981 Contract. Hasbroucks were the owners of the property. and had the rights of owners with regards to their relationship with Valeu at least through May 25, 1983, because as evidenced by the 1983 Agreement drawn by Valeu himself, Hasbroucks agreed to convey the property to Valeu by warranty deed. Apparently as of that date Valeu did not regard the 1981 Contract as breached, for he agreed to purchase the very property which he later went ahead and sold, apparently in reliance on the 1981 Contract without regard to the 1983 Agreement wherein he acknowledged Hasbroucks to be vested with sufficient title to convey by warranty deed! Up until May 25, 1983, the Court believes Hasbroucks' interests in the property were paramount to those of Valeu whose only right was upon default to cancel by written notice. But there was no default prior to May 25, 1983, when Hasbroucks sold the property to Valeu, and thereafter Valeu had no right to cancel the 1981 Contract because he had bought the property. His rights subsequent to May 25, 1983, were only as defined in the 1983 Agreement. Nothing in that Agreement suggests the parties contemplated that Hasbroucks would continue making monthly installment payments under the terms of the 1981 Contract. By the Agreement, Valeu expressly purchased the property from Hasbroucks for $53,016.32, including a cash payment of $20,000.00 to be made in two installments. The effect of the 1983 Agreement, the Court believes, was that Valeu immediately received the property subject only to a right to cancel on the part of Hasbroucks in the event the $20,000.00 cash payment was not made. The required $20,000.00 payment is not made conditional upon the sale of the property by Valeu to a third person. The obligation as it appears on the face of the Agreement is absolute. If the $20,000.00 were not received by Hasbroucks, they then had the right to cancel the Agreement and presumably in that event, but only in that event, resume the obligations of ownership including the continuing duty to make monthly installment payments under the 1981 Contract. Valeu now would wish this Court to declare Hasbroucks' rights in the property extinguished by reason of latches and the concomitant failure on the part of Hasbroucks to recommence making monthly payments under the 1981 Contract once he had defaulted in his obligation under the 1983 Agreement. Valeu, however, was all the while promising that his compliance with the 1983 payment schedule was immediate and that he was working on selling the home. When Hasbroucks finally discovered the truth, it was too late. Valeu had gone ahead and covertly listed and sold the property never telling the Hasbroucks that he had done so. As a consequence, he is by his action estopped from claiming latches on the part of the Hasbroucks in their failure to timely cancel the 1983 Agreement. When a person makes a promise which he should reasonably expect will cause forbearance, that promise is binding. Restatement (Second) of Contracts, *Promissory Estoppel* § 90. *See also Sohns v. Pederson,* 354 N.W.2d 852 (Minn.App. 1984).

■ The Court believes that Valeu at the time he entered into the 1983 Agreement knew Hasbroucks were current in their monthly obligation under the 1981 Contract and that neither party contemplated future payments under that Contract. The Court believes that Hasbroucks, by entering into the 1983 Agreement, understood and intended to be absolved from any further obligation under the 1981 Contract. Valeu, through his actions subsequent to May 1983, continued to foster in them a belief that they would receive their money and that they had no further obligation or responsibilities under the 1981 Contract. The

Court believes the fact that Valeu went ahead and sold the property to a third party without ever advising Hasbroucks, basing his action on an assumption that they had breached the 1981 Contract despite his previous acknowledgement of their interest in the property, is strongly indicative of an intent to defraud Hasbroucks completely.

From a totality of the circumstances, the Court believes what began in 1981 as an honest transaction became by May 1983 a calculated effort by Valeu to deceive Hasbroucks. He was the original seller, he had possession of the documents, he was a knowledgeable real estate investor, and he continually assured Hasbroucks that he would buy the property back. Yet, when he finally did buy it back through the 1983 Agreement, it was not a repurchase at all but a carefully contrived deception based upon a misrepresentation by Valeu that Hasbroucks would receive $20,000.00. This deception resulted in Hasbroucks losing any hope of recovering their $20,000.00 down payment and also resulted in the loss of their interest in the property, an interest which this Court believes continued irrespective of their failure to maintain monthly payments subsequent to May 1983. Again, this failure was due solely to Valeu's misrepresentations. From this rather lengthy analysis, the Court believes that each of the elements necessary to establish a cause of action under section 523(a)(2)(A) have been met.

Accordingly, IT IS ORDERED that the sum of $20,000.00 plus interest owing to the Plaintiffs, James A. Hasbrouck and Frances A. Hasbrouck, by the Defendant, Robert L. Valeu, is not discharged and judgment may be entered in favor of the Plaintiffs and against the Defendant in the sum of $20,000.00 plus interest from the installment due dates of July 22, 1983, and August 19, 1983, at the legal rate until paid.

JUDGMENT MAY BE ENTERED ACCORDINGLY.