Florence McBride, as Administratrix of the Estate of Charles J. McBride, Deceased, Claimant, v. State of New York, Defendant. (Claim No. 43146.)

Court of Claims, February 1, 1967.

*Louis Stark* for claimant. *Louis J. Lefkowitz, Attorney-General (Wayne M. Davis* of counsel), for defendant.

Caroline K. Simon, J.  Charles J. McBride, a 15-year-old boy, hung himself on October 23, 1962, from the rafter over his bed in the dormitory of a cottage on the grounds of the Warwick State Training School for Boys in Warwick, New York.  The Warwick School was established by the New York State Department of Social Welfare in 1932 as part of its program to combat juvenile delinquency in order " to provide a healthy environment in which rebellious adolescents can grow in physical and emotional stature with the counsel of those who understand the fears and needs of youth."

His mother, Florence McBride, as administratrix of his estate, sues the State of New York, claiming damages of $500,000 based upon negligent, careless and wrongful acts of its agents, servants and employees in connection with the care and treatment of Charles while he was in the custody of the State at Warwick.

Notice of intention to file the claim was received by the Clerk of the Court of Claims on January 22, 1963 and by the office of the Attorney-General on January 23, 1963.  The claim itself was timely filed in both offices on December 5, 1963 and has

neither been assigned nor brought before any other court or tribunal for determination.

During the trial, and after nine of claimant's witnesses and one State's witness had testified, claimant's counsel submitted letters of administration to the court, which letters had been granted by Surrogate Di Falco on January 18, 1963, but for which the decree was signed *nunc pro tunc* on April 15, 1966 as of January 22, 1963. The State objected to the admission of these letters, challenging their validity, and asserting that this court had no jurisdiction, since the letters had not been perfected within the time limit for filing a claim set forth in subdivision 2 of section 10 of the Court of Claims Act. Oral argument and written briefs on this objection were submitted by both parties.

The court, in a written memorandum on May 23, 1966 (50 Misc 2d 192), overruled the State's objection and admitted the letters into evidence. This decision was based upon the fact that the Surrogate had granted the petition for administration of the estate on January 22, 1963, at which time Mrs. McBride became empowered to act as administratrix, even though the decree itself was only submitted for signature on April 15, 1966, and was then signed by Surrogate Di Falco *nunc pro tunc* as of the earlier date.

The court regards the signing as a ministerial act, correcting an irregularity in procedure, under subdivision 6 of section 20 of the Surrogate's Court Act, which lists among the Surrogate's incidental powers the right " To open, vacate, modify, or set aside, or to enter as of a former time, a decree or order of his court ". The court, in its decision, cited *Merrick* v. *Merrick* (266 N. Y. 120) and cases cited therein, in support of its position. Thereafter, the trial continued.

For a proper understanding of this claim and determination of its validity, it is essential to sketch some of the background and family life of the McBrides prior to the fateful act. Only for this reason, therefore, it is stated that Florence McBride, the mother of Charles, had been married and had given birth to two daughters by her husband, Sidney McBride, who left her prior to the birth of Charles. She entered into a liaison with another man and Charles was born as a result of this union. Charles' father joined the Navy and Mrs. McBride saw him only once after his return from service, when he took Charles to Houston, Texas. Mrs. McBride testified to having gone there and taken Charles home with her. Since that time she has not seen Charles' father.

Charles' mother separated from Mr. McBride in November of 1946 when pregnant with Charles. During 1950 she met another man who is stated to have been the father of her two other children who also lived in the McBride home and were younger than Charles.

After his return from Texas, Charles resided either in his mother's apartment or with his maternal grandmother. Mrs. McBride did not work and the family has been maintained by public assistance.

To complete the background of Charles' home life, it is essential to note that Mrs. McBride testified that, during Charles' early years, she had stabbed and killed a man with whom she had been living, and who had assaulted her in her kitchen while he was drunk. She was acquitted of the charge of manslaughter on her defense that he had beaten her and that she acted in self-protection. Charles was not present during this incident, but an older sister witnessed the slaying.

Mrs. McBride had some difficulties with her two older daughters, and threatened them with court action upon a number of occasions. She brought them to the police when, in October of 1957, they came home from a department store wearing new coats and carrying new umbrellas taken by them from the store. Charles was with them at the time, but she asserted that he was not involved in the theft. At about this same period, Charles became a truant from school, his 4th grade report in 1958 showing absences of 50½ days as against 20½ days of attendance in the Spring term.

On New Year's Day in 1958, Charles, his two sisters, and two other children were brought into Children's Court on the charge of breaking into a toy shop and stealing three bicycles. Charles was placed on probation by the Children's Court as a first offender.

His mother testified that he ran away from home with his older sister two weeks later, and ran away again at other times. In each instance, the two children would stay away one or two nights, Mrs. McBride would report their absence to the police, and they would be picked up and brought home. Each time they returned Mrs. McBride stated that she would spank Charles and deny him privileges as punishment for having run away.

The Probation Officer's report to the Domestic Relations Court dated August 6, 1958 includes the following notations:

" On 6/2/58, Charles absconded from home.

On 6/26/58, Charles punched a teacher at P.S. 157, and broke away from the Principal who apprehended him.

On 7/20/58, Charles was apprehended by police at Coney Island after having stolen 600 tickets to a ride (the ' Whip '). ''

The psychiatric service report prepared on August 12, 1958 by the psychiatrist and addressed to the Justice presiding, states:

'' The material on the above named child was reviewed since being placed on probation. He has continued getting into difficulties and placement is indicated.

'' A review of previous examination, indicates that Charles is an emotionally disturbed child who is in need of placement in a residential treatment center. ''

Then, in July of 1958, Charles was placed in Youth House in The Bronx, for a time. The Juvenile Aid Bureau of the New York City Police Department, in an October 22, 1958 communication to the Bronx Children's Court lists the following:

'' 9/13/58 Attempted shoplifting of $59.87 worth of merchandise from Macy's Dept. Store.

9/21/58 Setting fires in trash cans at 34th St. & Bway BMT station.

9/22/58 Runaway from home since 9/18/58. Found wandering at 58th street and Bway at 1:00 A.M.

10/5/58 Runaway since 10/2/58. Found at 2:00 AM at 205th St. station on IND ' D ' line. ''

In October of 1958, Charles was accepted by Children's Village. The doctor's psychiatric intake interview, part of the records of that institution, included in its evaluation the following remarks: '' The significant people in this boy's life are a mother who was socially delinquent and two older sisters who very early showed delinquent behavior. It seems incredible that anyone could suppose that a boy of eight would be completely oblivious of the events surrounding his mother's stabbing her lover, her arrest, trial, etc., especially since there were two older sisters, one of whom witnessed the stabbing.''

Charles' stay at Children's Village was marked by frequent evidences of maladjustment and behaviour problems, including the theft of a bottle of vitamin pills and a jar of burn ointment from the infirmary. Seeing other boys go home, and having been denied that privilege for breaking rules, he twice ran home from Children's Village and each time was returned there by his mother, Charles crying all the way back to Children's Village, according to her testimony. He remained at Children's Village for more than three years until, in March of 1962, the director petitioned the Bronx Children's Court for his transfer '' on the grounds that he is a security risk and uncontainable in our program in that he requires constant day and night super-

vision on an individual basis above and beyond what our agency program allows for."

He was then stated to be "a very immature boy with little control of his impulses and no concern with respecting the rights and properties of other persons. His petty lying, stealing and disruptive behavior in school and the cottage have continued since his admission to the present time * * * Because of the poor prognosis in prolonging Charles' stay, it was recently decided to discharge him home and to arrange for his admission to a special school where he would be in a more structured environment. Charles could not tolerate any delay in implementing this plan and reacted by acting out and involved other boys. He stole money, a radio and medical supplies, ran away, forced boys to become involved with him sexually and also *threatened suicide if he was not sent home immediately.*"

The recitation of Charles' behaviour warranted sending him to Warwick, since by his conduct he met the definition set forth in article 6, section 371 of the Social Welfare Law, which states as subd. 6 "'Person in need of supervision' means a male less than sixteen years of age and female less than eighteen years of age who is habitually truant or who is incorrigible, ungovernable or habitually disobedient and beyond the lawful control of parent or other lawful authority."

On March 30, 1962, Charles McBride was admitted to the Warwick State Training School for Boys. This State facility is located in Orange County on 740 acres of rolling farm land. It consists of 30 odd buildings, which include 16 cottages, school and vocational buildings, administration, gymnasium, etc., and accommodates approximately 500 boys of the intermediate age of 14 years. Upon arrival, each boy is first assigned to an orientation cottage, along with other new arrivals for an initial three-week period. During this time he is physically examined by the medical and dental departments. He is studied and observed by staff specialists, his prior record is evaluated, and he is screened by the psychiatrist. Thereafter periodic case conferences are held to further the aim of diagnosis and treatment, a progress committee reviews the initial record, and the decision is made either for release or further treatment. Reviews are conducted at intervals of four months or less.

The program includes school classes for half of each day. The balance of the day is occupied in recreational and sports programs, maintenance chores, landscaping, and assistance in the specialized operations of the school.

After his initial orientation period, Charles McBride was assigned to Cottage B-1 on the Warwick grounds. This self-

contained building had an oblong 21 bed dormitory with a pitched roof and interior rafters criss-crossing it. The dormitory held two rows of beds separated by a center aisle. Each bed was flanked by a chest of drawers to accommodate the personal belongings of each boy. The dormitory was entered through a corridor from which doors opened to a shower room, a washroom, and a lavatory on one side, and a dressing room, closet and kitchen on the other side. The corridor at its other end led into a vestibule and entrance hall, in which a desk was placed facing the corridor and the dormitory entrance.

The permanent cottage parents regularly assigned to Cottage B-1 had been at Warwick for nine years and were experienced in handling the boys. In choosing cottage parents, the prescribed standards of education, training and experience differ necessarily and properly from the standards set for the professional staff. The criteria for cottage parents include intelligence, freedom from prejudice, trainability, normalcy of inter-relationship as a family unit, good adjustment, and a sense of responsibility as well as the ability to provide leadership and morale to troubled children, part of whose difficulties too often stem from unsatisfactory family backgrounds, as in the instant case. These standards, the court finds, are reasonable and suitable for the duties of cottage parents.

On the day this tragic event occurred, the male regular cottage parent was not on duty, having been granted a two-day pass. His wife was upstairs in their apartment on the second floor of B-1.

Some time previously, the husband had recommended his nephew and his nephew's wife as suitable cottage parents. They had been accepted by Warwick for a probationary period commencing June 21, 1962. The couple had spent four months at Warwick as probationary cottage parents at the time of the tragedy. Judged by the criteria mentioned above, they had been selected and trained and seemed, though still in their probationary period, to be usefully performing their assigned tasks. Part of their instruction, according to the Director of Warwick, was that corporal punishment was forbidden, and also that cottage parents should remain with troubled children during any emergency.

The probationary cottage wife testified that, at about 6:15 P.M. of October 23 while she was seated at her desk in the entrance hall working on records, Charles McBride emerged from the bathroom at a distance of 30 feet and exposed himself to her. She asked what he was doing and ordered him to stop. He ran back into the bathroom. She went into the dining room, there

told her husband of Charles' wrongdoing, and they both went into the bathroom to speak to Charles. There are variances in the testimony as to ensuing events. One version is that both husband and wife called Charles out of the bathroom and the husband asked Charles if he had committed the act about which his wife had complained. Another version is that the husband went into the bathroom and there talked to and chastised Charles. Despite all the discrepancies, it is clear that Charles was slapped by the man, who testified that he told Charles he'd '' be shipped for this '' and that Charles was in an hysterical condition when the husband left him in the bathroom.

The wife stated that she went to the foot of the stairway to inform her aunt of what had happened, while her husband went to turn on the cottage '' alarm light '' and to telephone the area supervisor. Both testified that, after the very brief span of time it took to place the call, they returned to the bathroom looking for Charles, only to find that he was not there.

The husband testified that, while standing in the bathroom doorway, he noticed a shadow out of the corner of his eye, in the direction of the dormitory entrance. He crossed the threshold and discovered Charles' body hanging from the steel rafter above the side of his bed, suspended from the neck by means of a sheet and bedspread knotted together and tied to the rafter. The husband loosened the knot and the body fell to the floor, the head hitting the wall as it fell. The autopsy report gave as the cause of death '' Edema of Brain due to hanging — laceration of gingiva occurring from fall after death.''

This wrongful death action is based upon the alleged negligence of the State in its failure to notify members of its staff of the potentially suicidal state of mind of Charles McBride, and its liability for the wrongful acts of the cottage parents, acting as its agents, in striking Charles and then leaving him alone and unattended, and that these acts and omissions were the proximate cause of the tragedy.

Since 1939, under section 8 of the Court of Claims Act, the State has waived its sovereign immunity from the negligence of its agents in its charitable and other institutions. (See Weber v. State of New York, 53 N. Y. S. 2d 598 [1945].) Accordingly, the State, in the care of its wards, is liable for the foreseeable consequences of its agents' acts or their omissions to act.

As in McPartland v. State of New York (277 App. Div. 103, 106 [1950]), the decision must be made as to whether the State is liable in the instant matter '' Since the Constitution does not

admit a liability of the State more broadly based than would be a private liability in like case, the main question here is the applicable rule of tort on these facts.''

Chief Judge CARDOZO, in *Palsgraf* v. *Long Is. R. R. Co.* (248 N. Y. 339, 344 [1928]) summarized the standard by which negligence is measured when he said: '' The risk reasonably to be perceived defines the duty to be obeyed ''. It is the task of this court to determine whether that standard has been violated.

In *O'Neil* v. *City of Port Jervis* (253 N. Y. 423, 433 [1930]), Judge CRANE succinctly defined the *Palsgraf* determinants when he said: '' The general underlying principle of that case is that the negligence does not exist unless there is a reasonable likelihood of danger as a consequence of the act complained of.''

Our eight State training schools, of which Warwick is one, have as their guiding purpose the rehabilitation of juvenile offenders and their ultimate restoration to a useful role in society. Their programs are prescribed by the State Department of Social Welfare, and stress the care and treatment of children as problems and not as criminals. Their goal is to prepare children for life in our society. The degree of supervision, the assignment of a boy to either a closed or open setting, his individual program of activities, all are determined by the evaluations made by the various staff specialists after the initial study of the boy, his background, prior history, and all other facts that can assist them in planning a positive and constructive program for him.

The State held a quasi-parental power over Charles, and thus was obliged to exercise every reasonable degree of care to protect him from injury, self-inflicted or otherwise. This responsibility does not extend to errors of professional judgment by competent physicians in their diagnosis or the treatment to be prescribed for a particular ward. It does, however, require the State, through its agents, to avert the foreseeable consequences of conduct over which it retains control.

Claimant alleges that Charles had suicidal tendencies. Psychiatric experts in children's behaviour, produced by both parties, had differing opinions as to whether the State should have been on notice that Charles was a suicidal risk. The court finds that, whether or not he was such a risk, he was nevertheless a troubled boy for whom the school had responsibility and to whom the school owed a duty of such care and supervision as would help ease his problems and tensions. That was the very purpose for which he was sent there.

The school rules indicate an awareness that corporal punishment and leaving disturbed children unattended foreseeably

could have unfortunate consequences, and made both such punishment and leaving a troubled child alone against the rules.

In the instant claim, the sequence of events included two direct violations by cottage parents of these rules; the one prohibiting corporal punishment, and the other leaving a disturbed child unattended. Whatever the provocation, it is just such provocative acts that demand the competence and self-control that the State has a right and need to expect of even its probationary cottage parents. The probationary cottage parents had served for four months previous to the suicide. They knew, or should have known, that striking or slapping a boy, quite apart from being a violation of the rules, would create a mental state that demanded that the boy not be left unattended.

Their negligence in leaving Charles, though each left with a definite purpose relating to the incident, constitutes a failure to recognize a potentially dangerous situation. Both acts, the striking and the departures, combine to become the proximate and producing cause of the ensuing tragedy, thus rendering the State liable. The court finds that reasonably prudent school management could have anticipated that, if Charles were hit and left alone thereafter, an unfortunate result could be expected.

The measure of damages for wrongful death is fair and just compensation for the reasonable expectancy of pecuniary loss to the relatives for whose benefit the action is brought. (See Decedent Estate Law, art. 5, § 132.)

Claimant would like the court to draw conclusions from testimony adduced as to Charles' affection for his mother and his employability, which would warrant the finding that Charles, had he matured, would have earned money and would have contributed to the support of his mother.

In making this finding, the court, even if it gave the fullest credence to all the testimony, would be compelled to speculate, and on the basis of such speculation, find that Charles would have lived his adult life outside of institutions.

A second speculation resting upon the first would require the finding that Charles would be gainfully employed. Woodcraft or belt exhibits, even though nicely done, did not demonstrate, of themselves, more than average manual skill for a boy his age. In a period of almost full employment, such as we presently fortunately enjoy, it is likely that Charles could have found some employment, but this court must speculate to find at what type of work and at what salary range he would function.

The third speculation is that, if outside an institution and if gainfully employed, Charles would support his mother. The court is asked to make this finding solely on the proof contained

in four letters he wrote to claimant from Warwick. In each, loving statements are made, and on the testimony of claimant and her mother, Charles repeatedly evidenced his deep affection for his mother.

Realistically, this assumption, that he would make substantial contribution toward the support of his mother, cannot be justified by the evidence adduced. However, the court does find Charles might have been of some financial assistance to his mother.

For all damages sustained by intestate's wrongful death, including pain and suffering from injuries before Charles' almost immediate death and therefore short period of pain, as well as for the pecuniary loss to his mother, the court awards the sum of $15,000, $3,000 of this sum being for pain and suffering, and $12,000 for wrongful death. Interest shall be paid on the latter $12,000 sum from October 23, 1962 to July 22, 1963 and from December 5, 1963 to the date of entry of judgment herein.