Leslie **FALKENSTEIN, Individually, and as Administrator of the Estate of Kevin Wayne Falkenstein, Plaintiff and Appellee,**

v.

**CITY OF BISMARCK and Richard Peck, Defendants and Appellants.**

**Civ. No. 9469.**

Supreme Court of North Dakota.

July 26, 1978.

As Corrected Aug. 10, 1978.

Vogel, Brantner, Kelly, Knutson, Weir & Bye, Fargo, for plaintiff and appellee; argued by John D. Kelly, Fargo.

Fleck, Mather, Strutz & Mayer, Bismarck, for defendants and appellants; argued by Thomas A. Mayer, Bismarck.

PEDERSON, Justice.

Kevin Falkenstein was born and raised at Wilton. While attending school in Wilton, he actively participated in athletics and was an excellent scholar. For three years and one quarter at North Dakota State University he studied game management and agriculture, maintaining a "B" average. At the end of the 1974 fall quarter he left NDSU to work and to make plans for his future. At age 21, in a tragic episode occurring in the early morning hours of February 21, 1975, he was dead.

Shortly after midnight Kevin, while intoxicated, was involved in an automobile accident on Main Avenue in Bismarck. He was arrested and charged with driving while under the influence of intoxicating liquor, and, when he could not post bond, he was held in the Bismarck city jail. He was moved into a cell described as "the hole" following an incident in which he "foul-mouthed" a Bismarck police officer. "The hole" was a small cell with solid walls. In it was a toilet bowl—otherwise the room was bare. It was lit only through two small grilled openings, one in the top of the door and one in the bottom. The opening at the top could be covered with a flap. The cell was in a noisy basement room which contained heating and other equipment. At nine o'clock in the morning Kevin was found dead, hanging from the cell door bars with his T-shirt knotted around his neck.

This suit was brought by Kevin's father against the City of Bismarck and Richard Peck, a sergeant on the Bismarck police force. The case was tried to a jury. Three causes of action were presented to the jury as follows:

(1) The City or Sgt. Peck, or both, were negligently responsible for Kevin's death (the wrongful death count);

(2) The City or Peck, or both, were responsible for negligently, and by cruel and unusual punishment, causing Kevin pain, suffering, humiliation, and physical and emotional harm from the time of his incarceration to the time of his death (the survival count); and

(3) Peck subjected Kevin to cruel and unusual punishment or treatment, and deprived him of his civil rights guaranteed by the constitution and laws of the United States (the 1983 count).[1]

In addition to actual damages, punitive damages were sought in the survival count and the 1983 count. The jury returned a verdict against the City on the wrongful death count in the amount of $27,000. The jury returned a verdict in favor of Peck and the City on the survival count. The jury returned a verdict against Peck on the 1983 count, and awarded actual damages of $25,000 and punitive damages of $6,000. Judgment was entered on the verdict. Peck and the City moved for judgment notwithstanding the verdict and for a new trial. Both motions were denied and Peck and the City appealed therefrom, as well as from the judgment entered on the verdict.

 The only error alleged to have occurred during trial involved the admission into evidence of the "Recommended Rules for Prisoners Treatment and Recommended Jail Facilities—County and City," and the jail inspection reports concerning the Bismarck city jail. The City and Peck argue that because these rules are only recommendations and do not have the force and

---

1. 42 U.S.C. § 1983 authorizes civil rights actions for damages. Both the City and Peck were originally charged in the 1983 count. Apparently that count was abandoned as to the City. No objection is raised on this appeal as to the jurisdiction of a state court hearing an action authorized by federal law. See footnote 17 in the dissent of Justice Brennan in Aldinger v. Howard, 427 U.S. 1, 36, 96 S.Ct. 2413, 49 L.Ed.2d 276 (1975). See, also, Monell v. Dept. of Social Services of New York City, ─── U.S. ─ ─ ─, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

effect of law, they cannot be admitted into evidence under any circumstances. It is likewise argued that the inspection reports and the testimony of the inspector should have been excluded. Although failure to comply with nonenforceable, recommended standards may not be a prima facie basis for liability, evidence of the existence of such standards is admissible to show knowledge of existence of risk and a measure of actions of a reasonable man, or of custom. See, Restatement Torts, Second, § 288B(2), and following. The trial court admonished and instructed the jury that a failure to follow the recommended rules was not evidence of negligence.

Peck and the City do not complain about any of the jury instructions given. It is argued that the evidence does not support the verdict. When considering whether evidence is sufficient to sustain a verdict, we draw all inferences in support of the verdict and consider the evidence in the light most favorable to the verdict. Rule 59(b)(6), NDRCivP; *Bladow v. Bladow*, 249 N.W.2d 917 (N.D.1977); *Jamestown Terminal Elevator, Inc. v. Hieb*, 246 N.W.2d 736 (N.D. 1976). We presume that all questions of fact within the province of the jury have been determined in a manner which supports the verdict. *Buehner v. Hoeven*, 228 N.W.2d 893, 904 (N.D.1975); *Watkins Products, Inc. v. Stadel*, 214 N.W.2d 368 (N.D. 1974). Whether or not the supreme court might view a jury's findings with skepticism or absolute trust is not a question on appeal. *Kresel v. Giese*, 231 N.W.2d 780, 791 (N.D.1975). We do not invade the province of the jury to weigh the evidence or determine the credibility of witnesses. *Buehner v. Hoeven, supra*. We will not, however, resort to suspicion, surmise, or conjecture to sustain a verdict. *Seaborn v. Kaiser*, 117 N.W.2d 863 (N.D.1962). See, also, *Bellon v. Bellon*, 244 N.W.2d 227 (N.D. 1976), and *Waletzko v. Herdegen*, 226 N.W.2d 648 (N.D.1975).

Falkenstein raises questions which concern the scope of our review in appeals from orders denying motions for judgment notwithstanding the verdict and from orders denying motions for new trial. In this case, in addition to the appeals from the orders denying their motions, Peck and the City appealed from the judgment. Recently we said:

"When a party appeals from an order . . . the review in this court is limited to those grounds which were presented to the district court. However, when there is an appeal from the judgment, the appeal is not limited to those issues raised in a motion . . . .. All issues which were properly preserved at the trial and raised on appeal are reviewable." *Davis v. Davis*, 268 N.W.2d 769 (N.D.1978).

The motion for judgment notwithstanding the verdict and the motion for a new trial are motions directed to the sound discretion of the trial court and will not be overturned on appeal unless it is clear that there was a manifest abuse of discretion. Rules 50 and 59, N.D.R.Civ.P.; *Dehn v. Otter Tail Power Co.*, 251 N.W.2d 404 (N.D. 1977); *Cook v. Stenslie*, 251 N.W.2d 393 (N.D.1977); *Reub's Minot Camera, Inc. v. General Elec. Cr. Corp.*, 209 N.W.2d 635 (N.D.1973). No abuse of discretion has been shown in this case. Motions for judgment notwithstanding the verdict should not be granted unless the evidence shows that the moving party is entitled to judgment on the merits as a matter of law. *Smith v. Michael Kurtz Construction Company*, 232 N.W.2d 35, 38 (N.D.1975).

## MERITS

In most situations a death by suicide is not an actionable event because, even though there may have been tortious conduct preceding the suicide, the suicide is ordinarily considered as an intentional act and not the result of the tort. This relieves the original actor of liability. See, generally, *Lucas v. City of Long Beach*, 60 Cal. App.3d 341, 131 Cal.Rptr. 470 (1976). An exception to this rule arises when the conduct of the tort-feasor causes a mental condition which results in an uncontrollable impulse leading to suicide. *Hamilton v. Chaffin*, 506 F.2d 904 (5th Cir. 1975); *Lucas v. City of Long Beach, supra; Tate v. Cano-*

*nica,* 180 Cal.App.2d 898, 5 Cal.Rptr. 28 (1960); *Dezort v. Village of Hinsdale,* 35 Ill.App.3d 703, 342 N.E.2d 468, 79 A.L.R.3d 1199 (1976); *Daniels v. New York, N.H. & H.R. Co.,* 183 Mass. 393, 67 N.E. 424 (1903); *State ex rel. Richardson v. Edgeworth,* 214 So.2d 579 (Miss.1968); *Arsnow v. Red Top Cab Co.,* 159 Wash. 137, 292 P. 436 (1930); *Orcutt v. Spokane County,* 58 Wash.2d 846, 364 P.2d 1102, 1105 (1961); *Bogust v. Iverson,* 10 Wis.2d 129, 102 N.W.2d 228 (1960).

The City argues that before liability for the negligent causation of such a mental condition can be imposed, there must be a showing that the injury (the suicide) was foreseeable. *McBride v. State,* 52 Misc.2d 880, 277 N.Y.S.2d 80 (C.C.1967). See, also, Annot.: Civil Liability of Prison or Jail Authorities for Self-Inflicted Injury or Death of Prisoner, 79 A.L.R.3d 1210. In this respect the City relies upon the following:

> "The controlling factor in determining whether there may be a recovery for a failure to prevent a suicide is whether the defendants reasonably should have anticipated the danger that the deceased would attempt to harm himself." [Citations omitted.] *Fernandez v. Baruch,* 52 N.J. 127, 244 A.2d 109, 112 (1968).

While the *Fernandez* opinion concerned a medical malpractice lawsuit and is distinguishable upon that ground alone, it is argued therefrom that there can be no liability because there was no showing that Kevin was suicidal prior to his being placed in "the hole." This argument misapprehends the evidence and the law. The issue is not only Kevin's prior mental condition. We are also concerned with the mental condition which resulted from his placement in "the hole." If the mental condition which caused Kevin's suicide existed before his incarceration, liability ordinarily could not be imposed under the rule that requires the mental condition to be caused by the actions of the tort-feasor. Absence of any prior mental illness of any kind, and, in particular, an absence of any prior threat or attempt at suicide, adds strength to the argument that the suicide resulted from the negligence of placing and leaving Kevin in

"the hole." It is true that notice of propensity to commit suicide would result in an obligation to exercise greater care in preventing the suicide.

In regard to the general question of foreseeability we have said that:

> ". . . the question of whether or not the injury was one that could have been reasonably anticipated is a question of fact for the jury. That is not to say, however, that a court may not decide that issue as a matter of law where the facts are such that reasonable men could not differ." *Kirton v. Williams Elec. Coop., Inc.,* 265 N.W.2d 702, 705 (N.D.1978).

The trial court did not decide the issue as a matter of law and, under the facts presented, properly refrained from doing so. Witnesses for the City acknowledged that there is a rule that each prisoner is required to remove his belt, shoelaces, and necktie prior to being placed in a cell. The purpose of the rule is to prevent the prisoner from harming himself. Former Chief of Police Kern acknowledged that one reason for maintaining "visual and hearing observation" of the prisoner "is an effort to try and avoid injury to prisoners, either accidental or self-inflicted." Upon this evidence alone the jury could conclude that Kevin's suicide was foreseeable. As the court noted in *Dezort v. Village of Hinsdale, supra,* 342 N.E.2d at 471:

> "That a prisoner who is alone in a cell is likely under some circumstances to injure himself or to commit suicide would appear to be reasonably foreseeable."

By way of comment as to what sort of circumstances might be the basis for a foreseeable suicide, we take note of the following statement made in testimony presented on November 1 and 2, 1977, to the North Dakota Legislature's Interim Committee on Corrections and Penalogy by Sharon A. Gallagher, Staff Attorney, Law Enforcement Council:

> "It is the alcohol or drug intoxicated class of persons which creates the largest headaches for jailers in this state. An experienced jailer will tell you that he

believes persons who are alcohol or drug intoxicated when booked into a jail *are the highest suicide risks of the jail's population.*" [Emphasis added.]

It is argued that the City was under a duty to protect Kevin from self-destruction. A quotation from an old but often-cited federal case is appropriate:

"If the law imposes a duty of care in respect of animals and goods which . . . [a sheriff] has taken into his possession by virtue of his office, why should not the law impose the duty of care upon him in respect of human beings who are in his custody by virtue of his office? Is a helpless prisoner in the custody of a sheriff less entitled to his care than a bale of goods or a dumb beast?" *State of Indiana v. Gobin,* 94 F. 48, 50 (C.C.D.Ind. 1899).

". . . the suggestion that law enforcement officers owe no general duty of care to those who have been arrested and incarcerated, but not convicted of any crime, is contrary to sound public policy." *Dezort v. Village of Hinsdale, supra,* 342 N.E.2d at 473.

Peck and the City cite *Lucas v. City of Long Beach, supra,* 131 Cal.Rptr. at 474, as setting forth the general rule that:

". . . a jailer is not liable to a prisoner in his keeping for injuries resulting from the prisoner's own intentional conduct. [Citation omitted.] Absent some possible *special circumstances* a jailer is under no duty to prevent the latter from taking his own life." [Emphasis added.]

We think the intoxicated prisoner can provide the special circumstance and that that is a matter for determination by the jury.

The general duty of care which is owed will require greater or lesser precautions depending upon the circumstances.

" 'The greater the danger the greater is the care required . . . What would be ordinary care in the case of extraordinary danger would be extraordinary care in case of ordinary danger, and what would be ordinary care in a case of little danger would fall below the required standard . . . .'" [Citation omitted.] *Chicago, M., St. P. & P.R. Co. v. Johnston's Fuel Liners,* 122 N.W.2d 140, 146 (N.D.1963).

In a case of injury to an intoxicated prisoner, the Nebraska Supreme Court has applied the above rule as follows:

"The police are not insurers of a prisoner's safety, but when a prisoner is intoxicated, a jailer has a duty to use a high degree of care to insure the prisoner's protection." *Daniels v. Andersen,* 195 Neb. 95, 237 N.W.2d 397, 401 (1975).

Other jurisdictions which have recognized or enunciated this rule are Georgia [*Thomas v. Williams,* 105 Ga.App. 321, 124 S.E.2d 409 (1962); *Kendrick v. Adamson,* 51 Ga.App. 402, 180 S.E. 647 (1935)]; Louisiana [*Shuff v. Zurich-American Insurance Company,* 173 So.2d 392 (La.App.1965); *Barlow v. City of New Orleans,* 257 La. 91, 241 So.2d 501 (1970)]; Illinois [*Dezort v. Village of Hinsdale, supra,* 342 N.E.2d 468]; and Michigan [*Thornton v. City of Flint,* 39 Mich.App. 260, 197 N.W.2d 485 (1972)].

In the instant case the provision of "the hole" by the City and its use by Peck may properly have been found by the jury to fall short of the ordinary duty of care owed to intoxicated prisoners. Likewise, the jury may have concluded that a failure of the City to provide proper observation and supervision was a breach of its duty to Kevin. Precisely such a breach of duty formed a basis for the decision in *Daniels v. Andersen, supra.* As in *Daniels,* the failure to supervise was a violation of jail rules by the City, acting or failing to act through its employees, the members of the police department.

▮ The City argues strenuously that because, under the wrongful death cause of action, the jury specifically found that Peck was not responsible for Kevin's death, the jury must necessarily have found that Peck did not proximately cause Kevin's death. We reject that contention for three reasons: (1) that the jury did not hold Peck blameless is demonstrated by the verdict in the 1983 action; (2) Peck had to function

through the facilities provided by the City, thus his conduct was not entirely voluntary; and (3) for reasons not explained to this Court, and not objected to, the special verdict form required that the jury assign responsibility for the negligence, if any, causing Kevin's death, to either the City or Peck, but not to both.[2] While it is true that the jury did not place responsibility on Peck, that is no demonstration that he was absolved of blame. Under the peculiar form of the special verdict, we can only conclude that the jury determined primary responsibility lay with the City.

■ Finally, the City argues that there was no proof that the conditions in "the hole" proximately caused Kevin's death. The case of *Maricopa County v. Cowart*, 106 Ariz. 69, 471 P.2d 265, 269 (1970), is relied upon thusly:

> "There was absolutely no testimony that the structure produced or contributed to a morbid state of mind of the deceased precipitating his suicide."

In the instant case there was expert testimony (from Dr. Stadter, a psychiatrist) that confinement in "the hole" was likely to induce severe depression. Additionally, in the instant case, a jury view of "the hole" was taken. The jury knew precisely what conditions in "the hole" were like. There was no real dispute in descriptions of "the hole" and all parties consented to the jury view. We think that there is substantial evidence to support a conclusion that Kevin's suicide was the result of a morbid state of mind proximately caused by his incarceration in "the hole" for an extended period of time. We presume that a view of "the hole" was useful to the jury in determining issues of fact and resolving any conflicts in the evidence. See *Weidmeier v. Edelman*, 75 S.D. 29, 58 N.W.2d 306 (1953).

2. "*QUESTION 1*: In connection with the plaintiff's first cause of action:

"A. Is the defendant Richard Peck responsible for the death of Kevin Wayne Falkenstein?
"Answer 'Yes' or 'No.' /s/ No
"*If your answer to Question 1A is 'Yes,' do not answer Question 1B. If your answer to Question 1A is 'No,' then answer Question 1B.*

## PUNITIVE DAMAGES

Peck argues that there is not sufficient evidence to sustain the award of punitive damages. The punitive damages, in the amount of $6,000, were assessed under the 1983 count of the action.

■ It is clear, beyond dispute, that punitive or exemplary damages are available in a 1983 action where the defendant has acted wilfully, or with malice, or with reckless disregard of the rights of the complaining party, or where he has not acted in good faith. See *Palmer v. Hall*, 517 F.2d 705 (5th Cir. 1975); *Aldridge v. Mullins*, 474 F.2d 1189 (6th Cir. 1973); *McDaniel v. Carroll*, 457 F.2d 968 (6th Cir. 1972).

■ The trial court instructed the jury that punitive damages "would only be authorized if the defendant Richard Peck has been guilty of oppression or malice, actual or presumed," and that:

> "Malice means a wish to vex, annoy, or injure another person or an intent to do a wrongful act. Malice may consist of a direct intention to injure another, or in a reckless disregard of his rights and the consequences that may result to him. Malice is not limited to a spiteful, malignant, or revengeful disposition and intent, but includes wrongful and improper motives or intent to do a wrongful and improper act. If a wrongful or improper act is willfully or deliberately done, the law presumes that the act was done with unlawful intent, and that the wrong done was actuated by malicious motives."

Peck does not question the propriety of this instruction. There was substantial evidence by which the jury could, without speculation, conclude that punitive damages were appropriate. We think the comments of the trial judge, made in a memorandum opinion denying a motion for a new trial, are particularly appropriate:

> "B. Is the defendant City of Bismarck responsible for the death of Kevin Wayne Falkenstein?
> "Answer 'Yes' or 'No.' /s/ Yes"
> [Emphasis added.]

"The evidence was generally to the effect that 'the hole' was used as a place for keeping unruly prisoners, but only until they quieted down. Mr. Falkenstein had been disruptive but was not at the time he was placed in 'the hole' nor at any time thereafter. Nevertheless, no attempt was made to return him to a regular cell. The jury might well have felt that the officer was not justified in placing him in 'the hole' or, alternately, having placed him there, should have removed him from this cell shortly thereafter. They may have also felt that the officer's action in placing him in 'the hole' was prompted by anger on the officer's part which would supply the necessary ingredient of malice. It is also to be observed that malice need not necessarily amount to ill will but may simply consist of lack of probable cause for engaging in the conduct."

We think the trial court's response to the motion was entirely appropriate. *Neidhardt v. Siverts*, 103 N.W.2d 97 (N.D.1960); *Powell v. Meiers*, 54 N.D. 336, 209 N.W. 547 (1926); *Shoemaker v. Sonju*, 15 N.D. 518, 108 N.W. 42 (1906).

It was not error to admit the evidence relating to recommended jail rules and jail inspections. The trial court did not abuse its discretion in denying the motions for judgment notwithstanding the verdict and for a new trial. There is substantial evidence sufficient to support the verdict of the jury. The judgment is affirmed.

ERICKSTAD, C. J., and PAULSON, SAND and VOGEL, JJ., concur.