[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is an action brought by Susan Schleidt administratrix of the estate of Rodney Schleidt against the defendant State of Connecticut for damages arising as a result of the death of Rodney Schleidt while in the custody of the Connecticut State Police.
The plaintiff was given permission to bring suit against the State of Connecticut by the Commissioner of Claims on September 27, 1988 in accordance with Section4-160 of the Connecticut General Statutes.
The plaintiff claims that the death of Rodney Schleidt and the losses sustained as a result thereof was caused by the carelessness and negligence of the employees of the State of Connecticut in one or more of the following ways:
A) In that they failed to properly and adequately evaluate the condition of the plaintiff's decedent prior to his detention in Cell No. 2;
B) In that they failed to properly and adequately evaluate the condition of the plaintiff's decedent during his detention in Cell No. 2;
C) In that they failed provide the plaintiff's decedent medication which had been prescribed for him by his CT Page 9771 physician, but withheld this medication;
D) In that they failed to properly monitor and supervise the activities of said plaintiff's decedent in Cell No. 2, when in the exercise of reasonable care, they could and should have done so;
E) In that they failed to properly and timely inspect the cell block area, including Cell No. 2, when they could and should have done so under the circumstances then and there existing; and
F) In that they failed to properly and adequately utilize the audio and video systems which provided regular opportunity for assessment of activities in Cell No. 2 by persons working in the desk area, although they could and should have done so under the circumstances then and there existing.
The court finds the following facts: On October 15, 1987 at approximately 8:17 p. m., on Route 9 near Exit 7 the plaintiff's decedent Rodney Schleidt (hereinafter referred to as Schleidt) was stopped for speeding by Trooper Robert Berry. Schleidt was south bound on Route 9 having left the Riverside Marina in Portland, Connecticut where he had spent from approximately 4:00 p. m. to 8:00 p. m. with his friend Charles Davis and had consumed approximately four or five drinks.
After being stopped by Trooper Berry for speeding Schleidt was required to take certain field sobriety tests because of a suspicion that he was driving while under the influence. He was taken into custody by Trooper Berry and transported to Troop F Barracks of State Police in Westbrook for processing. Schleidt, while at the barracks contacted Attorney Averum Sprecher by telephone. In the course of the process Schleidt agreed to and did take two intoximeter tests at 9:21 p. m. and 9:59 p. m. which showed blood level of alcohols of .162 and .149 respectively. During the processing, Berry completed various forms requiring certain information about the arrestee.
After the second test Schleidt was advised by Sergeant McGran that he would be released to a responsible and sober adult at approximately 1:30 a.m. on October 16th. At that time it was the general policy of Connecticut State Police at Troop F to release anyone picked up for driving while under the influence, approximately four hours after they had been taken into custody as long as a sober adult picked them up at the barracks. After he was advised of the CT Page 9772 time he would be released Schleidt made a second phone call to a friend of his by the name of Ernest Marcoux asking him to pick him up at approximately one or two a.m. Mr. Marcoux indicated that he had been drinking and it would be better if he picked up Schleidt early in the morning. Schleidt was taken to the processing room where additional information was received from him and certain of his possessions and clothing, including his belt were removed. Schleidt advised Trooper Berry that he was on medication and was taking tranxene and had taken some at approximately five or six p. m. Schleidt asked Trooper Berry to get his medication and Trooper Berry indicated he requested some other member of the State Police to obtain the medication but was unaware whether or not it was every received by Schleidt. During the further course of this processing when he removed his belt he said to Trooper Berry that he wasn't going to kill himself because he loved his daughter too much and he had too much to live for. Schleidt was placed in Cell No. 2 at approximately 10:14 p. m. At that time the cell block consisted of three separate cells located in the basement area of Troop F barracks in Westbrook, Connecticut. Approximately three days prior to this a video monitoring system had been installed at the desk area of the Troop. This video monitor showed approximately seven locations for two seconds each and continually repeated this cycle. Trooper Donald Kulisch was a desk officer on October 15, 1987 from 4:00 p. m. until 12:00 midnight. Barbara Mangino was the dispatcher on the same date for the same shift. Both Trooper Kulisch as the desk officer and Barbara Mangino as the dispatcher were able to see the video monitor and a view of Cell No. 2 where Schleidt was located approximately every 14 seconds. They were able to view Cell No. 2 and the prisoner Schleidt without getting up or moving from their locations at the desk and they merely had to look up at the monitors which were above them and in relatively close proximity to them. It was possible for them to be talking on the telephone and doing certain of their other duties and to be able to watch the video monitor at the same time. Prior to the installation of the video monitors it had been the policy of the State Police to make sure that either the desk officer or someone else went downstairs to the cell block and checked the prisoners every half hour. Trooper Berry last saw Schleidt at 10:28 p. m. at which time he was doing sit-ups on the bench in his cell.
A prisoner had been placed in Cell No. 1 at approximately 9:20 p. m. and another prisoner placed in Cell No. 3 at approximately 11:39 p. m. However, the cells were constructed in such a manner that they were walled on three sides and none of the prisoners could see each other from CT Page 9773 cell to cell. Informal and/or on the job training had been provided to Trooper Kulisch and Dispatcher Mangino concerning the operation of this video monitoring equipment. The video monitors transcribed what they saw on to a video tape which was submitted to the court for viewing in connection with this trial. This video tape shows Schleidt appearing to be tying a portion of shirt to the cell bars. During the period from 10:34 p. m. to 10:40:06 p. m. Schleidt appears to have tied one knot; however, that knot is off the bars and there is no abnormal activity to be observed at the 10:40:06 viewing. At 10:41:08 Schleidt appears once again to be tying a knot to the cell bar; at 10:42:12, he is shown standing with his hands behind him covering the knots; and at 10:42:38 p. m. Schleidt is shown to be standing with his back toward the bars and the camera. From 10:42 p. m. until 12:15 a.m. when Trooper McGovern noticed what appeared to be small light colored pieces of tape about one inch wide wrapped around the cell bars, Schleidt remained in exactly the same position. Trooper McGovern arrived at the barracks at approximately midnight and immediately upon going to the desk area at approximately 12:15 a.m. he observed on the monitor that something appeared to be wrong with Schleidt and attempted to contact Schleidt through the audio intercom, while locking on the video monitor to Cell No. 2, eliminating the other sequential views. Trooper McGovern then requested Trooper Confer to go down to the cell block and physically check the prisoner. During all of the time described on the evening of October 15, 1987 there was an audio communication system available from the cells to the front desk and vice versa. Trooper Confer was unable to get any response from Schleidt, noticed the discoloration of his face and cut him down. At this time Schleidt had been dead for quite some time. Trooper Kulisch and Dispatcher Mangino both testified that they never noticed anything unusual with regard to Schleidt during the entire time period particularly the one hour and thirty-three minute period from 10:42 p. m. until 12:15 a.m. During this time frame, Cell No. 2 was visible on the video monitor every fourteen seconds or approximately 398 times. It was also evident that occasionally for reasons unknown, the t.v. monitor would skip viewing Cell No. 2 but both Trooper Kulisch and Dispatcher Mangino had a view of Cell No. 2 at least 350-375 times between 10:42 p. m. and 12:15 a.m. when Trooper McGovern brought the situation to their attention.
At approximately 10:26 p. m. a serious motor vehicle accident occurred on Route 95 in Branford. Three or four people were killed in the accident and both Trooper Kulisch as desk officer and Dispatcher Barbara Mangino were very busy as a result of the very serious fatal accident. CT Page 9774 However their testimony indicates that most of their business and/or work consisted of telephone calls and calls on the radio. During all of these telephone calls and times that they were on the radio they could easily without interrupting their work see the video monitor and see what was transpiring in Cell No. 2. Schleidt's hanging himself by meanings of the ligature would result in cutting off his air way and would have caused his death in no less than four to six minutes, no more than twelve to fifteen minutes after the ligature was in place. Both Trooper Kulisch and Dispatcher Mangino had approximately eighty one opportunities to observe Schleidt from the period 10:38 p. m. until 10:57 p. m. which would be the time from which Schleidt began preparations to hang himself until the latest time at which he would have died. While this court recognizes that after 10:57 p. m. approximately fifteen minutes after Schleidt hung himself he was dead and that any actions of Trooper Kulisch the desk officer or Dispatcher Barbara Mangino would not have changed the ultimate situation, their constant continuous and persistent carelessness and negligence in not noticing the fact that Schleidt never moved for a period of one hour and thirty three minutes is an example of one of the factors of negligence at work during this evening. Trooper Mark Wallack placed a prisoner in Cell No. 3 at approximately 11:39 p. m.; and in doing so because of the physical lay-out of the cells was required to pass twice within a few feet of the tape that was hanging on the bars, going in and coming out. He also failed to observe or notice anything. The problem of jail suicides was commonly known by the late 70's and early to mid 80's and certainly prior to the date in question. It was also known that a majority of the persons who committed suicide while in cell custody were intoxicated. The standard of care for an intoxicated prisoner held in a jail cell such as the one at Troop F would require constant or close supervision by the custodian or jailer. Particularly with the existance [existence] of video monitoring. The custodian jailer should be able to respond within four minutes to a prisoner in distress. Schleidt's comments to Trooper Berry on the subject of killing himself was a red flag that should have made Trooper Berry and other members of the State Police alert to the fact that suicide had obviously crossed the mind of Schleidt. The combination of Schleidt being an intoxicated prisoner in the jail cell at Troop F combined with his statement about killing himself should have alerted the State Police that he was at a high risk for suicide and should have required extremely close or constant supervision of him on the video monitors, and created a high duty of care which the police failed to meet. Schleidt was at the time intoxicated to a degree that would substantially impair his usual logical CT Page 9775 mental processes. Once the video monitors displayed the information showing Schleidt's suicide preparations, an emergency began in Cell No. 2, but despite the emergency displayed, the police did not respond to Schleidt's situation for a prolonged period of time. The existence of a very serious automobile accident 15 or 20 miles away did not relieve the State Police of their duty of care. Trooper McGovern inadvertently furnishes further evidence of the State Police's breach of their duty of care to the prisoner Schleidt, when he immediately noticed upon his arrival at the barracks and the desk and first looking at the video monitors that something was wrong. The State Police were careless and negligent and breached the standard of care and duty required of them with regard to the custody of Schleidt. This court follows the ruling in White v. Town of Seekonk, 499 N.E.2d (42) Mass. App. Ct. 1986 and Falkenstein v. City of Bismark, 268 N.W.2d 787 in particularly the language of the Falkenstein court which is as follows:
 "The police are not insurers of a prisoner's safety but when a prisoner is intoxicated a jailer has a duty to use high degree of care to insure the prisoner's protection".
This court finds that there was foreseeability of a jail suicide under these circumstances and that the Connecticut State Police as the jailers had an affirmative duty to protect the prisoner Schleidt.
While this court has found that the Connecticut State Police were in fact negligent and did breach the duty of care owed to the prisoner Schleidt, we must of course find whether or not that negligence was the proximate cause or as more recently defined as substantial factor in causing the death of the prisoner Schleidt. This court agrees with the plaintiff's argument that where a foreseeable event results in harm to a person held in the custody of another and where the custodian's acts or omissions have increased the risk that harm of that general nature will occur, the custodian must, under Connecticut law assume the liability for injuries resulting. Doe v. Manheimer, 212 Conn. 748 and Pisel v. Stamford Hospital 180 Conn. 314.
The defendant has filed a special defense claiming that Schleidt, the plaintiff's decedent, was himself careless, negligent and/or reckless, and that his carelessness and negligence was a substantial factor in causing CT Page 9776 the injuries, losses and damages complained of. The defendant sets forth seven specific allegations and this court finds that with regard to the allegations set forth in paragraph D, namely that the defendant refused or failed to advise the defendants or give them any warning notice or notice whatever that he was depressed, anxious or otherwise inclined for whatever reason to harm himself; (E), that he failed to notify or warn the defendant that he was about to or was in the process of attempting to harm himself and (F), that he failed to request medical, psychiatric or psychological assistance, were in fact proven by the evidence.
Consequently, this court finds the State of Connecticut acting through the Connecticut State Police was 51% liable for the death of Rodney Schleidt and damages arising out of said death and that the plaintiff's decedent was himself 49% liable as a result of his negligence for his own death.
Turning to the issue of damages, it is quite clear from our law that there is no precise mathematical formula for determining just damages. However, in Floyd v. Fruit Industries, Inc., 144 Conn. 659 Supreme Court has given the trier of facts guidance by defining the element of just damages as follows:
 "Just damages include (1) the value of the decedent's lost earning capacity less deductions for . . . . (his) necessary living expenses in taking into consideration that a present cash payment will be made, (2) compensation for the destruction of . . . . (his) capacity to carry on and enjoy life's activities in a way. . .(he) would have and had (he) lived and (3) compensation for conscious pain and suffering. In addition his estate would be entitled to funeral expenses incurred.
The plaintiff's decedent, Rodney Schleidt, was born November 8, 1953. At the time of his death he had been employed by Pratt Witney Aircraft in Middletown as an assembler and inspector of airplane engine parts for approximately 11 years. He generally worked a 40 hour week and was earning an hourly rate of $12.65. He intended to work until he was 65 years old or for approximately 31 more years. The parties have stipulated that the decedent had a CT Page 9777 life expectancy of 40.5 years.
The court concludes that the plaintiff should be awarded $217,000 ($7,000 per year for 31 years — until 65) for the element of destruction of the decedent Rodney Schleidt for incapacity.
Secondly, the court awards the plaintiff funeral and burial expenses of $3,475.
Lastly, this court must consider compensation for the destruction of Rodney Schleidt's capacity to carry on and enjoy life's activities in a way he would have done if he lived. The evidence indicates that the decedent was in good health and that he pursued all of life's normal activities and in addition thereto he had purchased a 32 foot Trojan Boat which he used for tuna fishing and fishing in general. He was also mechanically inclined and held a pilot's license to fly an airplane. He had two of his own airplanes at one time. He was also engaged in building a two story 30' addition to the barn for additional living space for his wife and child. He had lived in Haddam Neck for most of his life and appeared to be a loving and caring father with regard to his daughter, Courtney, and also it was established he had a good relationship with his step son, Sean who he treated much like his own child. After a review of all of the evidence this court finds that a reasonable sum for the decedent's loss and enjoyment of life for the 40.5 years of life expectancy is $125,000.
In total the court finds the plaintiff is entitled to the sum of $345,475.00 in damages reduced by the 49% of his liability ($169,282.75).
Judgment shall enter in favor of the plaintiff Susan Schleidt as administratrix of the estate of Rodney Schleidt against the defendant State of Connecticut in the amount of $176,192.25 plus costs.
O'CONNELL, J.
Judgment may enter in accordance with the foregoing Memorandum of Decision Michael Kokoszka, Chief Clerk